# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# 3:09cv361-RJC-DCK

| | |
|---|---|
| DEW ELECTRIC, INC., | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) |
| MASS ELECTRIC CONSTRUCTION CO. and ALDRIDGE ELECTRIC, INC. d/b/a MASS-ALDRIDGE, a Joint Venture; TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA; & CONTINENTAL CASUALTY COMPANY, | ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

ORDER

**THIS MATTER** is before the Court on Mass-Aldridge's ("MAJV") motion for partial summary judgment (Doc. No. 28) and the related briefs in support and opposition (Doc. Nos. 29, 32, & 34). For the reasons set forth below, the Court will **GRANT** the motion.

## I. BACKGROUND

Defendant MAJV, a joint venture and general contractor, entered into two "Prime Contracts" with the City of Charlotte's Charlotte Area Transit System ("CATS") in 2005. Under those contracts, MAJV agreed to construct the Traction Power & Overland Catenary System (Contract 8) and Train Control & Communication (Contract 9) portions of CATS's new South Corridor Light Rail Project. In order to help fulfill its obligations under these two Prime Contracts, MAJV entered into two subcontracts with DEW Electric, Inc. ("DEW") in March and April 2005. Under the subcontracts, DEW agreed to perform a portion of the Prime Contract work.

The Prime Contracts required that the work be completed by March 2, 2007, unless delays resulted in agreements between CATS and MAJV to extend the time of completion. If extensions were granted, CATS and MAJV would negotiate "requests for equitable adjustments" ("REAs"), in which claims for additional compensation by MAJV and its subcontractors would be negotiated and settled. MAJV had authority to settle the claims for additional compensation on behalf of its subcontractors. Section 19(a) of the subcontracts between MAJV and DEW states:

> In the event of any request or claim by Subcontractor seeking additional . . . compensation which arises out of or is related to . . . changes to or defects in the Prime Contract, . . . Subcontractor agrees to be bound to Contractor to the same extent that Contractor is bound to [the City] . . . . Subcontractor agrees to be bound by any final determination as rendered on its claim, . . . and Subcontractor shall in no event be entitled to receive any greater amount from Contractor than Contractor is entitled to and actually does receive from [the City] on account of Subcontractor's claims . . . and Subcontractor agrees that it will accept such amount, if any, received by Contractor from [the City] as full satisfaction and discharge of such claims. Subcontractor agrees that it will not take any other action with respect to any such claims.

(Doc. No. 17-2 at 5). Section 19(c) of the subcontracts states that the "Subcontractor shall be bound by Contractor's determination, made in good faith, as to apportionment of any amounts received by Contractor from [the City] on behalf of Subcontractor and other claimants, including Contractor, whose work is affected by any act or omission of the [City]." (Id. at 6).

Delays occurred during MAJV's and its subcontractors' performance of the work. Consequently, CATS and MAJV negotiated two REAs in 2007. The first, "REA-1," covered the period from March 2 through August 31, 2007. The second, "REA-2," extended the final completion date of the Prime Contracts to November 27, 2007. Under REA-2, CATS and MAJV negotiated separate settlement amounts for Contracts 8 and 9. Under Contract 9, the City paid MAJV a $1,000,000 global settlement of all outstanding claims brought by MAJV and its subcontractors. This settlement was 40% of the $2,460,268 claimed by MAJV and its

2

subcontractors under Contract 9. Upon receiving the settlement funds, MAJV tendered to DEW $45,000, which was 40% of the REA-2 amount that DEW had claimed under Contract 9. MAJV tendered the $45,000 conditioned on DEW's signing a change order releasing any further claims against MAJV related to such delay. DEW refused to sign the change order releasing further claims against MAJV, and MAJV thus declined to pay the $45,000 for Contract 9. Similarly, under Contract 8, CATS agreed to pay MAJV $236,000 of the $393,351 MAJV and its subcontractors claimed. MAJV admits that CATS specifically agreed to pay $49,332 of DEW's $61,225 claim. MAJV tendered to DEW the $49,332 it had received from the City under REA-2 for Contract 8. MAJV conditioned this payment, too, on DEW's signing a change order releasing any further claims against MAJV related to such delay. DEW refused to sign the change order releasing further claims against MAJV, and MAJV thus also failed to release the $49,332 for Contract 8.

In the second breach of contract allegation in its amended complaint, DEW alleges that MAJV owes it $113,349.24, rather than the $45,000 tendered under REA-2 for Contract 9. DEW's third breach of contract claim alleges that MAJV owes it $61,225, rather than the $49,332 tendered under REA-2 for Contract 8.

MAJV, in supporting its previous motion for partial summary judgment (Doc. No. 17)[1], has admitted it owes DEW (1) the $45,000 and $49,332 previously tendered; (2) $847.28 under DEW's claim six; (3) $2,209.50 under DEW's claim eight; and (4) $2,705.30 under DEW's claim nine. MAJV has also argued in support of its counterclaim that DEW owes MAJV an overpayment of $3,820.44 regarding DEW's claim seven. All told, MAJV has admitted it is liable to DEW for the total amount of $96,273.64. DEW moved for partial summary judgment, seeking immediate

---

[1] The Court denied this motion as premature by Order dated March 5, 2010 (Doc. No. 27).

payment of this $96,273.64, as well as treble damages and attorneys' fees under the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen. Stat. § 75-1.1. The Court denied DEW's motion by Order dated March 5, 2010 (Doc. No. 26). By Order dated April 14, 2010, the Magistrate Judge granted in part and denied in part DEW's motion to compel discovery and to extend the time for completion of discovery (Doc. No. 35).[2]

MAJV now moves for summary judgment as to DEW's claims for fraud, violation of the UDTPA, and punitive damages.

## II. LEGAL STANDARD

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. The nonmoving party must present sufficient

---

[2] The Magistrate Judge's Order denied the request to extend discovery. It did give MAJV until May 15, 2010, to produce certain discovery items regarding prior cases involving MAJV and DEW proposals submitted to the City by MAJV. The April 14, 2010, Order of the Magistrate Judge does not, however, affect the instant Order of the Court.

evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the Record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 129 S. Ct. 2658, 2677, 557 U.S. ___ (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

## III. DISCUSSION

MAJV seeks summary judgment as to DEW's claims for fraud, violation of the UDTPA, and punitive damages.

### A. Timeliness of the motion

DEW initially asserts it has had insufficient time to develop its claims. It points out that MAJV responded to its discovery request on January 26, 2010, by making documents available to DEW. DEW requested over 15,600 pages, which MAJV produced on February 17, 2010. DEW claims its review of these documents is still underway. However, the end of discovery was initially set for January 15, 2010, yet DEW did not serve its First Set of Interrogatories and Requests for Production until December 17, 2009. By agreement of the parties, MAJV responded on January 25 or 26, 2010, and made the requested documents available for DEW to inspect and copy. DEW has failed to show why its own delay in requesting discovery should delay the Court's consideration of this motion. Further, more than two months have passed since the instant motion was filed, and DEW has not sought to supplement its evidence with any newly uncovered evidence.

DEW further points to its motion to compel discovery. The Magistrate Judge granted in part this motion on April 14, 2010. Pursuant to the Magistrate Judge's Order, DEW should have received by May 15, 2010, the materials MAJV was ordered to produce. The Magistrate Judge also denied the aspect of DEW's motion that sought an extension of time to complete discovery. Because discovery is complete, and because, as discussed below, much of the information gathered through DEW's motion to compel is tangential to the claims in dispute, the Court finds no reason to delay in determining the instant motion.

**B. DEW's fraud and UDTPA claims**

North Carolina General Statutes § 75-1.1 states that unfair or deceptive acts or practices in or affecting commerce are unlawful. "'To prevail on a claim of unfair and deceptive . . . practices, a plaintiff must show: (1) defendants committed an unfair or deceptive act or practice; (2) in or affecting commerce; and (3) that plaintiff was injured thereby." Cullen v. Valley Forge Life Ins., Co., 589 S.E.2d 423, 430 (N.C. Ct. App. 2003) (quoting First Atl. Mgmt. Corp. v. Dunlea Realty Co., 507 S.E.2d 56, 63 (N.C. Ct. App. 1998)). A UDTPA claim is not barred simply because it arises out of a breach of contract claim. Id. "Ordinarily, '[u]nder section 75-1.1, a mere breach of contract does not constitute an unfair or deceptive act'; however, aggravating circumstances, such as deceptive conduct by the breaching party, can trigger the provisions of the Act." Id. (quoting Becker v. Graber Builders, Inc., 561 S.E.2d 905, 910 (N.C. Ct. App. 2002)). Where the same course of conduct gives rise to a traditionally recognized cause of action, such as an action for breach of contract, and as well gives rise to a cause of action for violation of section 75-1.1, damages may be recovered either for the breach of contract or for violation of the UDTPA. Id.

However, in interpreting North Carolina's UDTPA, the Fourth Circuit has recognized that "unfairness inheres in every breach of contract when one of the parties is denied the advantage for

which he contracted, but this is why remedial damages are awarded on contract claims." United Roasters, Inc. v. Colgate-Palmolive Co., 649 F.2d 985, 992 (4th Cir. 1981). Thus, even an intentional breach of a valid contract does not violate the statute. Id. In this sense, North Carolina law does not allow a party to transmogrify a claim for simple breach of contract into a claim for unfair and deceptive trade practices absent "substantial aggravating circumstances." See Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331, 347 (4th Cir. 1998) (citing Branch Banking & Trust Co. v. Thompson, 418 S.E.2d 694, 700 (N.C. Ct. App. 1992)). A plaintiff's allegations under the UDTPA must be "distinct from" the allegations regarding a breach of contract, and not based on the "existence of an agreement, the terms contained in the agreement, and the interpretation of an agreement." Id.

Similarly, to sustain a claim for fraud under North Carolina law, DEW must prove MAJV made a definite and specific representation which was materially false; that it made the representation with knowledge of its falsity and with the intent to deceive DEW; that it was reasonably relied on by DEW and that DEW was injured thereby. Schlieper v. Johnson, 672 S.E.2d 548, 552 (2009) (quoting Lillian Knitting Mills Co. v. Earle, 237 N.C. 97, 105, 74 S.E.2d 351 (1953)). In order to state a claim for fraud, there must be more alleged than "a sheer possibility that a defendant has acted unlawfully." Ashcroft v. Iqbal, 129 S. Ct. at 1949.

As the Fourth Circuit stated in Broussard:

The distinction between tort and contract possesses more than mere theoretical significance. Parties contract partly to minimize their future risks. Importing tort law principles of punishment into contract undermines their ability to do so. Punitive damages, because they depend heavily on an individual jury's perception of the degree of fault involved, are necessarily uncertain. Their availability would turn every potential contractual relationship into a riskier proposition.

155 F.3d at 346. It is with this caution that North Carolina courts have proceeded when determining under what circumstances a plaintiff may assert a fraud or UDTPA claim based in part on an alleged breach of contract. The state's courts have held that there must be "something more" than a mere breach of contract – aggravating circumstances of some sort. See id. at 346-47.

DEW corrals a host of North Carolina cases, attempting to group its own claims with cases where North Carolina courts have found "something more" was at issue. These cases include Garlock v. Henson, where a defendant repeatedly denied having sold a tractor even though he had, and attempted to extinguish a plaintiff's ownership interest in the tractor by forging a bill of sale. 435 S.E.2d 114 (N.C. Ct. App. 1993). The court found that this evidence of overt fraud, which was separate from the underlying contract, allowed the plaintiff to independently support both a cause of action for contract and for a violation of the UDTPA. DEW also cites Cullen v. Valley Forge Life Insurance Co., where the "something more" was a letter falsely denying insurance coverage. 589 S.E.2d 423 (N.C. Ct. App. 2003). DEW further points to Johnson v. Colonial Life and Accident Insurance Co., where the breach of contract was accompanied by evidence of the employer's wrongfully using the accusation of a false claim as a pretext for terminating the plaintiff. 618 S.E.2d 867 (N.C. Ct. App. 2005). Each of these cases present scenarios where an independent tort or UDTPA claim is identifiable from a contractual claim. DEW, however, fails to provide evidence of that "something more."

### 1. Alleged REA-1 misrepresentations

DEW first asserts MAJV inflated DEW's REA-1 costs to $371,039 when submitting them to CATS, when DEW had only claimed REA-1 costs of $214,018.67. DEW further asserts MAJV falsely told DEW that CATS had approved only $156,667.02 of those costs when CATS had

actually approved more. DEW maintains these alleged misrepresentations are aggravating circumstances that are identifiable from the breach of contract claim.

The evidence of record, however, shows that MAJV paid DEW a total of $409,451 for REA-1. See (Doc. Nos. 34-2, 34-3). DEW claims MAJV's underpayment is reflected in change orders three and four, which add up to $156,667.02. These change orders, however, represent only MAJV's REA-1 payment to DEW for overhead, vehicles, and equipment. These change orders do not reflect MAJV's REA-1 payments to DEW for staff ($197,186) and rental equipment ($55,598). Thus MAJV actually paid DEW more ($409,451), rather than less, than it submitted to CATS ($371,039) as DEW's costs for REA-1. DEW offers no evidence to the contrary.

Regarding DEW's assertion that MAJV misrepresented DEW's costs to CATS, DEW cannot sustain a fraud or UDTPA claim by proving harm only to CATS. DEW's assertion of such a claim is likely not justiciable from a standing perspective. But even if DEW had standing to assert it, North Carolina law would not support the claim. DEW relies on the Jennings Glass case for the proposition that a breach of contract paired with a pattern of deceitful practices can alone sustain a UDTPA claim. Jennings Glass Co. v. Brummer, 362 S.E.2d 578 (N.C. Ct. App. 1987). However, in Jennings Glass, the plaintiff was among those whom the defendant had deceived. Id. at 584. More on point is Miller v. Ensley, where the court held a plaintiff could not sustain a UDTPA claim because it was based on misrepresentations to third parties rather than the plaintiff. 365 S.E.2d 11, 14 (N.C. Ct. App. 1988). The court noted that "[t]his misrepresentation, or 'deception,' had no impact on the damages to [the plaintiff]." Id. Likewise here, DEW has provided no evidence of damages to itself from the alleged misrepresentation to CATS. In this light, much of the information DEW sought in its motion to compel, namely information regarding similar schemes and practices as evidence of MAJV's intent to engage in fraudulent accounting and billing practices, is irrelevant

9

to DEW's claims. Because any alleged misrepresentations to CATS did not affect DEW, evidence of similar schemes and practices are irrelevant to DEW's claims for fraud and violation of the UDTPA.

### 2. Alleged REA-2 misrepresentations

DEW next alleges MAJV falsely represented to DEW that only 40% of DEW's REA-2 costs were approved by the City, when in fact the settlement with the City was or should have been for over 80% of DEW's subcontractor costs.

MAJV has submitted an affidavit from CATS's representative to the negotiation, confirming that the amounts reached in settlement of the REA-2 claims match what MAJV told DEW. See (Doc. No. 17-4, ¶¶ 6-7). The essence of DEW's claim is thus not that MAJV paid DEW less than MAJV received from CATS in settlement of DEW's REA-2 costs. Rather, DEW claims MAJV agreed to different terms with CATS than what DEW had agreed to allow, and that MAJV then misrepresented to DEW that it was a "take it or leave it" offer from CATS. However, MAJV had a large degree of authority under the subcontracts to settle the claims for additional compensation on behalf of its subcontractors. Whether MAJV exceeded that authority and breached this provision of the subcontract is a purely contractual question, rather than an aggravating circumstance.

Furthermore, even if MAJV misrepresented to DEW that CATS's offer was a "take it or leave it" proposition, such post-hoc description of a negotiation does not alone springboard the scenario into the realm of fraud or unfair competition. The question is whether MAJV had authority to settle DEW's claims with CATS as it did, or whether MAJV exceeded its authority under the subcontracts – a question of contract law. Further, the existence of any separate agreement between DEW and MAJV, outside their binding subcontracts, as to how MAJV should negotiate REAs with CATS is a question of contract law and evidence, not of fraud or unfair competition.

### 3. Alleged post project end date misrepresentation

DEW further alleges MAJV represented to DEW that the contract with the City restricted recovery of costs incurred after the project end date. DEW claims that while this representation accurately describes the contract provisions, MAJV requested additional compensation for work after the contract end date, and MAJV requested and received compensation for another subcontractor, Union Switch and Signal ("US&S"), for work after the contract end date.

DEW's argument is confused. DEW first states MAJV represented to DEW that the contract restricted recovery for any work done after the project end date. Then, DEW admits this representation "accurately describes the contract provision." (Doc. No. 32 at 7). Finally, after admitting MAJV accurately represented the provision, DEW contends that since MAJV or US&S may have received compensation for work after the project end date, such occurrence somehow evidences untruthfulness on the part of MAJV. The Court will not speculate as to why or how it may have happened that CATS allegedly paid out money to MAJV or US&S for work completed after the project end date. Such payments would fall outside the contract under DEW's own interpretation of it. While DEW might feel it is unfair, it admits that it was not owed any money for post-end-date work.[3] Thus DEW can show no loss for such work. The Court fails to perceive any aggravating circumstance or untruthfulness here that would support a fraud or UDTPA claim.

## IV. CONCLUSION

Because DEW cannot sustain its claims for fraud or violation of the UDTPA, it also cannot sustain its claim for punitive damages. This is a breach of contract action. The law does not subject

---

[3] See Matthew 20: 13-14 (New International Version) ("Friend, I am not being unfair to you. Did you not agree with me for the usual daily wage? Take what is yours and go.").

the defendants to the possibility of tort or treble damages in what is a simple commercial dispute over a relatively clear contract.

**IT IS, THEREFORE, ORDERED** that MAJV's motion for partial summary judgment as to plaintiff's fraud, UDTPA, and punitive damages claims (Doc. No. 28) is **GRANTED**. DEW's claims for fraud, violation of the UDTPA, and punitive damages are hereby **DISMISSED**.

**SO ORDERED.**

Signed: May 25, 2010

Robert J. Conrad, Jr.
Chief United States District Judge